**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Dawn Constance Gowens,<br>Plaintiff,<br>v.<br>Commissioner of Social Security,<br>Defendant. | No. CV-25-00328-TUC-AMM (EJM)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is Plaintiff Dawn C. Gowen's Opening Brief (Doc. 16). Defendant filed his Answering Brief ("Response") (Doc. 20), and Plaintiff replied ("Reply") (Doc. 21). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. §§ 405(g), 1383(c). Compl. (Doc. 1).

Pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure,[1] this matter was referred to Magistrate Judge Markovich for Report and Recommendation. Based upon the pleadings of the parties and the administrative record submitted to the Court, the Magistrate Judge recommends that the District Judge REVERSE and REMAND the decision of the Commissioner.

## I. BACKGROUND

### *A. Procedural History*

On November 30, 2022, Plaintiff protectively filed a Title II application for Social

[1] Rules of Practice of the United States District Court for the District of Arizona.

Security Disability Insurance Benefits ("DIB") alleging disability as of July 27, 2022, due to a lumbar sprain, right shoulder sprain, bilateral hip pain, and right knee pain. *See* Administrative Record (AR) at 15, 18, 55–60, 62, 66–68, 70, 74, 179, 182, 191, 209, 212, 215, 236, 248, 292, 296. The Social Security Administration (SSA) initially denied Plaintiff's application on June 2, 2023. *Id.* at 15, 49–65, 84–88. On June 9, 2023, Plaintiff filed a request for reconsideration, and on November 7, 2023, SSA denied Plaintiff's application upon reconsideration. *Id.* at 15, 66–77, 96–99. On December 4, 2023, Plaintiff filed her request for hearing. *Id.* at 15, 100–01. On June 3, 2024, a telephonic hearing was held before Administrative Law Judge ("ALJ") Christina Young Mein. *Id.* at 15, 31–54. On July 3, 2024, the ALJ issued an unfavorable decision. AR at 15–25. On July 29, 2024, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on April 22, 2025, review was denied. *Id.* at 1–5, 304–05. On June 20, 2025, Plaintiff filed this cause of action. Compl. (Doc. 1).

***B. Factual Background***

Plaintiff was fifty-nine (59) years old at the time of the alleged onset of her disability, and sixty (60) years old at the time of her administrative hearing. AR at 15, 23, 31, 35, 37, 55–57, 62, 66–67, 74, 179, 182, 191, 194, 207, 209, 212, 236, 248, 292, 296. Plaintiff graduated from high school. *Id.* at 23, 39, 55, 57, 63, 66, 76, 213. Prior to the alleged onset of her disability, Plaintiff's past relevant work included electrician, lumber associate, stocker, and construction worker. *Id.* at 36, 41–43, 76, 213–14, 228–35.

**1. Plaintiff's Testimony**

**a. Administrative Hearing**

Plaintiff testified that she lives with her oldest sister, who is seventy-eight (78) and disabled. AR at 38. Plaintiff reported that she occasionally helps her sister bathe, tries to cook for her, and takes her to appointments. *Id.* Plaintiff explained that her sister is able to transfer herself in and out of her wheelchair; however, when Plaintiff accompanies her sister to appointments, they require a third person to assist with the wheelchair because Plaintiff is unable to lift it. *Id.*

Plaintiff confirmed that she has a driver's license, with her glasses as the only restriction. *Id*. Plaintiff estimated that she drives approximately three (3) times per week. *Id*. She described driving to Walmart or the grocery store, approximately four (4) to five (5) miles from home. AR at 38–9.

Plaintiff further confirmed that she was a high school graduate and completed an electrical apprenticeship program, obtaining a journeyman's license in 1996. *Id*. at 39. Plaintiff denied having health insurance, and testified that she receives care through the Veterans Administration ("VA"). *Id*. Plaintiff also testified that she served from 1981 to 1984 and receives $1,300.00 per month in VA disability benefits. *Id*. Plaintiff explained that she was determined sixty (60) percent disabled based upon the reduced use of her right hip, as well as mental health issues that arose from stress, both of which are service related. *Id*. at 40. Plaintiff denied currently working or volunteering. AR at 40.

Plaintiff testified that she last worked from September to December of 2023. *Id*. Plaintiff described the job as a temporary position, less than twenty (20) hours per week, in which she supervised a crew of people, which entailed reading blueprints and directing and explaining the task to be completed when a worker was unsure. *Id*. at 40–1, 47–49. Plaintiff explained that each day she would come in and look around to see what had been accomplished after she had left the site the previous day. *Id*. at 47. She would then talk with the crew, show them on the blueprint what should be done, and explain why something was being done. *Id*. at 47–8. Plaintiff would then sit, perform a repair or a task that was necessary, and attempted to change positions (walking, standing, sitting) frequently. AR at 48. Workers would come and ask Plaintiff questions regarding how to do something, and she was able to show them by shining a flashlight up into the open ceiling, explaining what material was needed, and what tasks to perform. *Id*. Afterward, Plaintiff would sit down. *Id*. Plaintiff observed that when there were more questions, the more she was required to exert herself physically. *Id*. Plaintiff testified that the added weight of her work boots caused her significant fatigue and described the constant movement making her feel like she had been on the jobsite for a full eight (8) hours, when it was only three (3) or four

(4) hours. *Id*. Plaintiff noted that when she was on site for more than four (4) hours, it was very hard on her. AR at 48. Plaintiff observed that she would be physically unable to go in the following day. *Id*. Plaintiff confirmed that she left the job because it ended—as with any construction job, once the building is finished, the workers move on. *Id*. at 49. Plaintiff further testified that the person who hired her did not have any other similar positions. *Id*. She observed that the other available positions would have been a detriment to her physical well-being. *Id*.

Prior to this, Plaintiff worked as a maintenance electrician working on the military installation at Fort Washington. AR at 41. Plaintiff described the job to include repairing outlets and repairing or installing light fixtures, but also required some light construction duties. *Id*. Plaintiff further described lifting and carrying fifty (50) pounds or more in the execution of this position. *Id*.

Plaintiff further testified that prior to the Fort Washington position she worked at Chiricahua Community Health Centers. *Id*. Plaintiff reported being hired as an electrician similar to Fort Washington; however, the job required her to do general construction and involved building a children's clinic. *Id*. at 41–2. Plaintiff described the work as "very heavy" and confirmed lifting and carrying over fifty (50) pounds. AR at 42. Next, the ALJ inquired about a position at Sun Life Assurance; however, Plaintiff did not recall the company. *Id*. at 42–3. Plaintiff testified that after she had lumbar surgery, she was assigned to clean doctors' offices, which she contemplated that she may have been working for a different company at that point. *Id*. at 43. Plaintiff further testified that at Home Depot, she worked in the lumber department initially, then moved to stocking more generally. *Id*. Plaintiff noted that the lumbar department work was more demanding; however, even in the general stocking position, she was lifting upwards of thirty (30) pounds, as well as using mechanical equipment to clean floors. *Id*. Plaintiff confirmed that her work at Walmart was similar to what she did at Home Depot, but opined that the Home Depot job was more strenuous because of her time in the lumber department. AR at 43.

Plaintiff testified that since she had lumbar surgery, she cannot bend in a normal

fashion. *Id*. at 43–44. Plaintiff described needing to bend with her knees or legs while holding on to something. *Id*. at 44. She further reported that she gets a searing pain from the middle of her back into her buttocks and down into her legs. *Id*. Plaintiff explained that the pain can occur with a small turn, lifting, bending, or other type of movement, and the pain in her legs is like a knife. *Id*. Plaintiff further testified that her hips have degenerative arthritis and bursitis which prevent her sitting for any length of time. AR at 44. Plaintiff also testified that when she attends appointments, she has pain after riding in the car which requires stretching and walking prior to going into the appointment. *Id*. Plaintiff noted that she takes medication for the pain, but has to do so in a way that does not make her drowsy when she drives. *Id*. Plaintiff testified that she has continuous problems with her knees, that prevent her from kneeling for any length of time. *Id*. Plaintiff explained that the pain in her knees also aggravates her hip and back pain. *Id*. Plaintiff described having a fall at work which exacerbated the pain in her back and hips, as well as caused two (2) rotator cuff tears, and observed that the fall was the cause of her stopping work. AR at 44–5. Plaintiff further testified that "they did not address" her right arm pain for four (4) or five (5) months, and she was unable to use her right arm during this time.[2] *Id*. at 45. Plaintiff noted that once she began receiving treatment, there was a concern that she would not be able to "go through the physical therapy," which would result in Plaintiff needing surgery; however, she was ultimately able to tolerate the physical therapy. *Id*. Plaintiff explained that although she regained the use of her right arm, she is still unable to reach up without "resetting" it or using her left arm. *Id*. Plaintiff also reported pain in her right arm when reaching forward. *Id*.

Plaintiff testified that she takes medication daily. AR at 45. Her pain medication includes gabapentin, duloxetine, and diclofenac; she takes omeprazole for her stomach; and blood pressure medications. *Id*. Plaintiff denied side effects generally, but reported that sometimes she "can fall asleep at the drop of a hat" and attributed this to the cumulative

---

[2] Plaintiff did not specify who "they" refers to, but the context implies that she is referring to her medical providers.

effect of her medications. *Id*. at 45–6.

Plaintiff described her typical day to include waking up; taking her gabapentin and omeprazole; performing some stretching or other light exercise to get her body moving; helping her sister if needed—Plaintiff explained that her sister usually has a caregiver during the day, but sometimes that individual is unavailable; Plaintiff rests after providing assistance; puts together a light lunch, which she and her sister eat together; then Plaintiff starts to prepare dinner, because she is unable to make it all at once and requires rest breaks and stretching between tasks; some days she will go and get things from the store, walking around the store is part of her exercise which her providers have encouraged; after returning home she will stretch and lie down; Plaintiff tries to do one light housework task per day; prepares dinner, but leaves the dishes for the following day because she is unable to stand for long periods; and occasionally visits with a friend. *Id*. at 47–8.

Upon questioning by her attorney, Plaintiff estimated that she can stand in one place for approximately twenty (20) to thirty (30) minutes, but acknowledged that might be an overestimate. *Id*. at 49. Plaintiff reiterated that she stands at home to prepare meals, but takes regular breaks to sit or lie down. AR at 49. Plaintiff further estimated that she could walk for twenty (20) to thirty (30) minutes before needing a break. *Id*. at 49–50. Plaintiff noted that this estimate was based on the time she spends at the grocery store, with the maximum time thirty (30) minutes that she walks in the store for exercise. *Id*. at 50. Plaintiff testified that the maximum she could lift would be approximately fifteen (15) pounds. *Id*. She explained that she cannot lift an entire case of water—she has the store load it in her vehicle, then opens it to take a few bottles in the house at a time. *Id*. Finally, based on her most recent work experience, Plaintiff estimated that the maximum she could be on her feet was three (3) hours. AR at 50. She observed that while working, she could not last a full four (4) hours. *Id*. Plaintiff issued a clear denial when asked if she could work a forty (40) hour week in a similar position. *Id*.

. . .

. . .

**b. Administrative Forms**

***i. Function Report—Adult***

On April 11, 2023, Plaintiff completed a Function Report—Adult. AR at 220–66. Plaintiff reported that she lives in a house with family. *Id.* at 220. Plaintiff described the limitations caused by her medical conditions as follows:

> 2019 I had a lumbar fusion which makes it difficult to sit for long periods of time and to bend over[.] I had a military injury which makes it impossible to kneel, I also have extreme difficulty with ladders or other machinery.

*Id.* Plaintiff further described her typical day to include showering; getting dressed; eating breakfast; taking her morning medication; stretching for therapy; picking up her home, as necessary; watching television; eating lunch; taking a nap; taking her other medications; taking a walk; stretching again; making dinner, eating, and cleaning up; and going to bed. *Id*. at 221. Plaintiff noted that she will also perform "[o]ther chores, as necessary. *Id.* Plaintiff confirmed that she cares for her sister, who is wheelchair bound. AR at 221. Plaintiff reported that she is unable to lift the chair, so requires assistance if her sister needs to be driven somewhere. *Id.*

Plaintiff described her abilities prior to the onset of her conditions to include running, riding a bicycle, bowling, dancing, going to movies, sitting, and walking for long periods of time; however, following the onset of her condition, she can no longer perform these activities. *Id.* Plaintiff reported that her conditions interfere with her sleep, because she wakes up throughout the night and needs to reposition herself due to pain. *Id*. Additionally, Plaintiff is unable to turn over while lying down. *Id*. Plaintiff further reported that she uses a shower chair to bathe, and it takes her two (2) to three (3) hours to wash and dry her hair. AR at 221. Plaintiff denied needing reminders or help to perform personal care tasks or take her medicine. *Id*. at 222.

Plaintiff also reported that she cooks full course meals or sandwiches, and frozen meals. *Id*. at 222. Plaintiff conveyed that she prepares food or meals four (4) times per week, and estimated that it takes her an hour and a half or more, with frequent breaks for

stretching and sitting. *Id.* Plaintiff noted that she does the laundry and cleans around the house as needed, in an effort to limit the amount of time spent on cleaning. *Id.* Plaintiff estimated that she can do these tasks for thirty (30) minutes to an hour before she experiences pain requiring her to stop. AR at 222. Plaintiff stated that she requires help cleaning the bathroom, because she cannot bend. *Id.* Plaintiff also stated that she is unable to clean the outside. *Id.*

Plaintiff reported that she tries to go outside and sit on her porch daily, but does not leave often. *Id.* at 223. Plaintiff confirmed that she can drive a car and go out alone. *Id.* Plaintiff reported that she shops in stores, purchasing household supplies; food; and necessities. AR at 223. Plaintiff estimated that she tries to go twice a week and it takes about an hour. *Id.* Plaintiff also confirmed that she can pay bills, count change, handle a savings account, and use a checkbook/money orders. *Id.* Plaintiff conveyed that her ability to handle money has changed since the onset of her conditions, because she loses track of things sometimes. *Id.*

Plaintiff listed her hobbies and interests as including watching television, getting fresh air on her porch, reading, and going to the park. *Id.* Plaintiff expressed that she tries to do these things often. AR at 224. Plaintiff described an inability to play sports, doing anything for long periods, and drowsiness from her medications as changes since the onset of her illnesses that impact her hobbies and interests. *Id.* Plaintiff confirmed she hangs out, plays chess, and watches movies with other people on a daily basis, and these activities take place in-person, on the phone, texting, or via video chat. *Id.* Plaintiff noted that she also goes to therapy daily and denied that she requires someone to accompany her. *Id.* Plaintiff denied having difficulty getting along with family, friends, neighbors, or others. AR at 224. Plaintiff listed changes in her social activities following the onset of her condition to include an inability to play sports, ride bikes, go to movies, and go out to dinners. *Id.*

Plaintiff reported that her conditions affect her ability lift, squat, bend, stand, walk, sit, kneel, climb stairs, complete tasks, concentrate, and use her hands. *Id.* at 225. Plaintiff

explained that she can only stand for a couple of minutes; develops pain if she does anything too long; becomes drowsy and falls asleep when trying to concentrate due to her medications; and is developing arthritis which causes hand pain. *Id*. Plaintiff noted that she is right hand dominant; can walk approximately ten (10) minutes before needing to stop and rest; and needs to rest five (5) to ten (10) minutes before she can resume walking. *Id*. Plaintiff conveyed that she can pay attention but gets drowsy after awhile. AR at 225. Plaintiff reported that she can following instructions, both written and spoken, very well. *Id*.

Plaintiff confirmed that she gets along with authority figures, and denied having ever been fired or laid off from a job because of problems getting along with other people. *Id*. Plaintiff expressed that she hands stress "okay" depending on the day, but clarified that the stress that comes as a result of her pain, she cannot handle. *Id*. at 226. Plaintiff noted that she can handle changes in routine. *Id*. Plaintiff reported she has a constant fear of falling. AR at 226. Plaintiff confirmed using a walker prescribed by her doctor "a few times a month." *Id.* Plaintiff noted that she wears glasses. *Id*. Plaintiff listed her medications as including Gabapentin, Duloxetine, and Diclofenac, all of which cause drowsiness. *Id*. at 227.

***ii. Work History Report***

On April 11, 2023, Plaintiff completed a Work History Report. AR at 228–35. Plaintiff listed her jobs prior to the onset of her disability to include electrical maintenance, building maintenance and construction in a health center, Home Depot floor associate, Walmart store maintenance, a period of unemployment, and electrical construction. *Id*. at 228.

Plaintiff described the Electrical Construction position as full time—eight (8) hours per day, five (5) days per week. *Id.* at 229. Plaintiff reported earning $19.00 per hour and explained that the job entailed installing and repairing wiring, electrical fixtures, and control equipment; ensuring concealed wiring was finished before walls were installed; connecting wiring to lighting fixtures or power equipment; ensuring the safety of the

install; and repairing faulty electrical equipment. *Id.* Plaintiff confirmed that the job involved using machines, tools, or equipment; but did not use technical knowledge or skills, or writing or completing reports. *Id.* Plaintiff reported in this position she walked for two and a half (2.5) hours per day; stood for five (5) hours per day; sat a half hour (0.5) per day; climbed and crouched for two (2) hours per day; stooped, crawled, and reached for one (1) hour per day; kneeled for three (3) hours per day; and handled, grabbed or grasped big objects, as well as wrote, typed, or handled small objects for three and a half (3.5) hours per day. AR at 229. Plaintiff explained that she carried her twenty-five (25) pound toolbelt and electrical equipment, as well as other tools or materials from the truck to the jobsite, and then around the jobsite, as needed. *Id.* Plaintiff stated that fifty (50) pounds was the heaviest weight she lifted, while she frequently lifted twenty-five (25) pounds. *Id.* Plaintiff denied supervising others or being a lead worker. *Id.*

Plaintiff described the Walmart Store Maintenance position as eight (8) hours per day, four (4) days per week. *Id.* at 230. Plaintiff reported earning $8.00 per hour and explained that the job entailed repairing and maintaining the store; using machinery and electrical equipment and power tools; dismantling devices to remove affected parts; lubricating and cleaning parts, as needed; repairing building structures, as needed; and replacing light bulbs and ceiling fixtures using a lift. AR at 230. Plaintiff confirmed that the job involved using machines, tools, or equipment; but did not use technical knowledge or skills, or writing or completing reports. *Id.* Plaintiff reported in this position she walked for two and a half (2.5) hours per day; stood for five (5) hours per day; sat a half hour (0.5) per day; climbed and crouched for two (2) hours per day; stooped, crawled, and reached for one (1) hour per day; kneeled for three (3) hours per day; and handled, grabbed or grasped big objects, as well as wrote, typed, or handled small objects for three and a half (3.5) hours per day. *Id.* Plaintiff explained that she carried her toolbelt, which she estimated weight twenty-five (25) to thirty (30) pounds; carried equipment or materials needed around the store; pushed around the tool cart, ceiling fixtures, store shelving, as needed; and carried bags of salt or charcoal. *Id.* Plaintiff stated that eighty (80) pounds

was the heaviest weight she lifted, while she frequently lifted thirty (30) pounds. *Id.* Plaintiff denied supervising others or being a lead worker. AR at 230.

Plaintiff described the Home Depot Floor Associate position as eight (8) hours per day, four (4) days per week. *Id.* at 231. Plaintiff reported earning $9.00 per hour and explained that the job entailed storing and distributing materials/merchandise; handling customer orders and work orders; sorting items on racks, bins, or shelves according to product; marking materials with identifying information; assisting customers with questions; and retrieving items from top shelves using a lift. *Id.* Plaintiff confirmed that the job involved using machines, tools, or equipment; but did not use technical knowledge or skills, or writing or completing reports. *Id.* Plaintiff reported in this position she walked for two and a half (2.5) hours per day; stood for five (5) hours per day; sat a half hour (0.5) per day; climbed and crouched for two (2) hours per day; stooped, crawled, and reached for one (1) hour per day; kneeled for three (3) hours per day; and handled, grabbed or grasped big objects, as well as wrote, typed, or handled small objects for three and a half (3.5) hours per day. *Id*. Plaintiff explained that she carried concrete bags, merchandise, or other items, weighing eighty (80) pounds or more, around the store. AR at 231. Plaintiff further described removing items from shelves and top shelves using a lift, and estimated that these items generally weighed over twenty-five pounds. *Id*. Plaintiff stated that eighty (80) pounds was the heaviest weight she lifted, while she frequently lifted twenty-five (25) pounds. *Id.* Plaintiff denied supervising others or being a lead worker. *Id.*

Plaintiff described the Health Center Building Maintenance and Construction position as full time—eight (8) hours per day, five (5) days per week. *Id.* at 232. Plaintiff reported earning $16.00 per hour and explained that the job entailed building and repairing buildings; building the foundation of buildings; laying concrete, plaster; and following directions from the blueprint or building plan. AR at 232. Plaintiff confirmed that the job involved using machines, tools, or equipment; but did not use technical knowledge or skills, or writing or completing reports. *Id.* Plaintiff reported in this position she walked for two and a half (2.5) hours per day; stood for five (5) hours per day; sat a half hour (0.5)

per day; climbed and crouched for two (2) hours per day; stooped, crawled, and reached for one (1) hour per day; kneeled for three (3) hours per day; and handled, grabbed or grasped big objects, as well as wrote, typed, or handled small objects for three and a half (3.5) hours per day. *Id.* Plaintiff explained that she carried the framing, wood or other materials that weighed over forty (40) pounds and required two (2) people to lift. *Id.* Plaintiff further described carrying her tool belt, which weighed in excess of twenty-five (25) pounds, as well as concrete bags and other items. *Id.* Plaintiff stated that forty (40) pounds was the heaviest weight she lifted, while she frequently lifted twenty-five (25) pounds. AR at 232. Plaintiff denied supervising others or being a lead worker. *Id.*

Plaintiff described the Electrical Maintenance position as full time—eight (8) hours per day, five (5) days per week. *Id.* at 233. Plaintiff reported earning $12.00 per hour and explained that the job entailed installing and repairing the electrical system, following electrical code; using hand and power tools; repairing fault electrical equipment; diagnosing issues in electrical equipment; and ensuring wiring was wired correctly. *Id.* Plaintiff denied that the job involved using machines, tools, or equipment; technical knowledge or skills; or writing or completing reports. *Id.* Plaintiff reported in this position she walked for two and a half (2.5) hours per day; stood for five (5) hours per day; sat a half hour (0.5) per day; climbed and crouched for two (2) hours per day; stooped, crawled, and reached for one (1) hour per day; kneeled for three (3) hours per day; and handled, grabbed or grasped big objects, as well as wrote, typed, or handled small objects for three and a half (3.5) hours per day. AR at 233. Plaintiff explained that she carried her twenty-five (25) pound toolbelt, as well as other materials or equipment which weighed sixty (60) pounds or more. *Id.* Plaintiff stated that sixty (60) pounds was the heaviest weight she lifted, while she frequently lifted twenty-five (25) pounds. *Id.* Plaintiff denied supervising others or being a lead worker. *Id.*

**2. <u>Vocational Expert Jennifer Smidt's Testimony</u>**

Ms. Smidt testified as a vocational expert at the June 3, 2024, administrative hearing. AR at 15, 50–53, 289–90. On June 4, 2024, following the administrative hearing,

the ALJ requested additional information from Ms. Smidt and propounded written interrogatories upon her. *Id*. at 291–98.

In response to the ALJ's request to classify Plaintiff's past work, Ms. Smidt testified that her most recent position of supervisor was not performed long enough to be classified. *Id*. at 51. Regarding Plaintiff's other positions, Ms. Smidt began by noting Plaintiff's past work of maintenance electrician was a composite position. *Id*. She went on to describe the position of maintenance electrician, Dictionary of Occupational Titles ("DOT") number 829.261-018, with a Specific Vocational Preparation ("SVP") of 8, medium exertional level, although performed heavy and combined it with construction worker, DOT number 869.664-014, an SVP of 4, heavy exertional level, and performed as heavy. *Id*. at 51–2. Next, Ms. Smidt described the Home Depot position as a lumber yard worker, DOT number 929.687-030, an SVP of 3, heavy exertional level, and performed as heavy. AR at 51.

The ALJ asked Ms. Smidt to consider a hypothetical individual with the Plaintiff's age, education, and work experience, who has the ability to perform medium exertional work; could frequently balance; frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently stoop and crouch; occasionally kneel and crawl; and occasionally reach overhead with the right upper extremity. *Id*. at 52. The ALJ inquired whether such an individual would be able to perform Plaintiff's past work. *Id*. Ms. Smidt denied that such an individual would be able to perform Plaintiff's past work. *Id*. The ALJ then asked whether there were any transferable skill from Plaintiff's past jobs that would meet the hypothetical. *Id*. Ms. Smidt again answered in the negative. AR at 52.

Plaintiff's counsel then inquired about the same hypothetical individual, but with the added limitations of only being able to walk and stand for three (3) hours of an eight (8) hour workday and able to lift ten (10) pounds frequently and fifteen (15) pounds occasionally. *Id*. at 52–3. Plaintiff's counsel asked whether such on individual would be able to perform Plaintiff's past work. *Id*. at 53. Ms. Smidt answered in the negative. *Id*. Plaintiff's counsel further asked whether there were any transferable skills to work within those limitations. *Id*. Ms. Smidt again answered that there were not. AR at 53. The ALJ

followed-up asking whether there were any transferable skills to light work. *Id*. Ms. Smidt stated that there were not. *Id*.

The following day, the ALJ sent Ms. Smidt a vocational interrogatory and instructed her to complete and return it. *Id*. at 291–94. Ms. Smidt completed the interrogatory form, which described Plaintiff's past relevant work as maintenance electrician, DOT number 829.261-018 combined with construction worker, DOT number 869.664-014; lumber yard worker, DOT number 929.687-030; and stock clerk 299.367-014. *Id*. at 296.

The ALJ asked Ms. Smidt to consider a hypothetical individual the same age as Plaintiff, with at least a high school education, and with the same work experience outlined in the previous sentence. AR at 296. The ALJ further instructed Ms. Smidt to assume that the hypothetical individual had the residual functional capacity to perform medium work, with limitations including she can frequently balance, climb ramps and stairs, stoop, and crouch; and occasionally climb ladders, ropes, or scaffolds, kneel, crawl, and reach overhead with the right upper extremity (her dominate hand). *Id*. The ALJ inquired whether such an individual would be able to perform Plaintiff's past work. *Id*. at 297. Ms. Smidt opined that such an individual would not be able to perform Plaintiff's past work. *Id*.

The ALJ next asked if "there [were] any conflicts between the occupational evidence [Ms. Smidt] . . . provided . . . and the occupational information contained in the DOT and/or the SCO." *Id*. Ms. Smidt denied any conflicts, but noted that "those publications don't address overhead reach, [and] consideration is based on my vocational knowledge [and] experience." AR at 297.

Next, the ALJ asked if the hypothetical individual could "perform any unskilled occupations with jobs that exist in the national economy at the medium exertional level?" *Id*. Ms. Smidt answered in the affirmative and listed three (3) possible positions. *Id*. First, Ms. Smidt listed Counter Supply Worker, DOT number 319.687-010, with an SVP of 2, medium exertional level, and 37,239 jobs available in the national economy. *Id*. Next, Ms. Smidt noted Cleaner, Lab Equipment, DOT number 381.687-022, with an SVP of 2,

medium exertional level, and 29,900 available jobs.[3] *Id.* Finally, Ms. Smidt provided Order Filler, DOT number 922.687-058, with an SVP 2, medium exertional level, and 162,548 available jobs. AR at 297.

The ALJ's final question was whether there were any conflicts between the occupational evidence Ms. Smidt provided regarding unskilled, medium exertional level positions and the DOT and/or the SCO. *Id.* at 298. Ms. Smidt referred to her prior answer regarding conflicts, in which she denied any conflicts, and noted that "those publications don't address overhead reach, [and] consideration is based on my vocational knowledge [and] experience." *Id.*

### <u>3. Plaintiff's Medical Records</u>

#### a. Treatment Records[4]

Plaintiff is a veteran who has service related disabilities that the Veterans Administration has determined and rated as follows: 1) chronic adjustment disorder (50%); neuralgia of sciatic nerve (10%); inflammation of sciatic nerve (10%); and neuralgia of ilio-inguinal nerve (0%). AR at 839. On February 8, 2019, Plaintiff underwent a posterior lumbar laminectomy and interbody fusion at L4/L5. *Id.* at 358, 366, 368, 868. Then, on July 26, 2022, she fell at work tripping on uneven sidewalk, initially falling to her knees and hands, then fell to the right and tried to protect her face with her right arm. *See id.* at 358, 366, 435, 440, 445, 452, 458, 466, 560, 683. Plaintiff reported that she was doing fine prior to the fall, but developed pain shooting down both legs after and felt that her back and hip pain had regressed to pre-surgery levels. *See id.* at 356, 358, 437, 440, 445, 452, 458.

Initially following the fall, Plaintiff's care was managed worker's compensation. *See id.* at 356, 368, 560. Beginning May 2022 and continuing through September 2022, Plaintiff received hypnosis treatments for pain, listening to audio recordings, with her pain

---

[3] For the last two jobs listed, Ms. Smidt did not note whether the jobs are available in the national economy or regionally.

[4] The Court has reviewed the entirety of Plaintiff's medical records, but its summary is generally limited to records after her alleged onset date.

ranging from 4/10 to 5/10. *See id*. at 356–57, 365–66, 370–73, 379–86. Also following her fall, Plaintiff consistently described low back pain, bilateral hip pain, bilateral knee pain, pain around her greater trochanter, and right groin pain to her providers at the Southern Arizona Veterans Association Healthcare System ("SAVAHCS"). AR at 366, 374, 387, 395. Beginning on September 21, 2022, Plaintiff began treating with Jeffrey D. Scott, M.D. at Palo Brea Pain and Rehabilitation for her low back pain, bilateral hip pain, and right shoulder pain; her treatment continued through February 1, 2023. *Id*. 435–68.

On December 21, 2022, Plaintiff began treating with Christopher Stevens, M.D. at Tucson Orthopaedic Institute for her right shoulder pain. *Id*. at 683–85. In addition to examining Plaintiff's shoulder, Dr. Stevens noted her joint stiffness and unsteady gait. *Id*. at 683. Dr. Stevens noted positive Speed's and Yergason's tests; positive Neer and Hawkin's impingement signs; the presence of mild scapular dyskinesia; and tenderness to palpation over the long head of the biceps in the bicipital groove. *Id*. Dr. Stevens reported Plaintiff had an "[i]ncomplete rotator cuff tear or rupture of [her] right shoulder" which was worsening. *Id*. at 684. Dr. Stevens discussed the possibility of steroid injections, but this is limited because too much cortisone can damage cartilage. *Id*. Dr. Scott reported that a September 30, 2022, Magnetic Resonance Imaging ("MRI") of Plaintiff's lumbar spine "demonstrates postoperative change consistent with prior spinal fusion and mild degenerative facet disease." *Id*. at 458, 466. Dr. Scott further noted that on November 16, 2022, Plaintiff underwent an MRI of her cervical spine "demonstrates moderate disc degermation at C5-6[;] [m]ild to moderate interspinous ligament sprain at C5-6 and mild at C6-7." *Id*. at 458, 466, 476–86.

Concurrent with her treatment by Dr. Scott and Dr. Stevens, Plaintiff attended Max Motion Physical Therapy for treatment of her bilateral hip pain and right shoulder pain following her fall. *See id*. at 560–675, 717–57. Plaintiff's physical therapy appointments began in August 2022 and continued through April 2023. *See id*. In total, Plaintiff attended forty-three (43) physical therapy appointments. AR at 752. Plaintiff's pain levels generally varied between 2/10 to 8/10 for her low back, bilateral hips, and right shoulder, although

later treatments focused only on her right shoulder which on some days dropped to a 0/10 pain level at best. *See id.* at 560–675, 717–57. Throughout Plaintiff's physical therapy treatment, she continued to have pain with abduction of her right arm. *See id.* On February 1, 2023, Dr. Stevens noted that Plaintiff showed improvement in her right shoulder with physical therapy and recommended continuing this treatment. *Id.* at 687. Dr. Stevens observed that if Plaintiff showed regression in her shoulder, they could try injections. *Id.* Dr. Stevens reiterated this recommendation in March 2023. *Id.* at 689. On April 26, 2023, Dr. Stevens acknowledged that Plaintiff may be at her maximum medical improvement without further intervention. *Id.* at 68. He discussed treatment options with Plaintiff including injection therapy, surgical intervention, or return to physical therapy. *Id.*

Beginning in August 2023 and continuing through March 2024, Plaintiff saw Tap Duong, DC at Tap Into Wellness Chiropractic. AR at 773–812. During these sessions, Plaintiff received regular acupuncture treatments for bilateral pain of the cervical, thoracic, and lumbar spine, as well as bilateral neuromuscular re-education. *See id.* Although variable, Plaintiff's back pain continued to hover around 4–6 out of 10. *See id.* On April 23, 2024, Plaintiff underwent a second bilateral Greater Trochanter bursa injection for pain. AR at 854–61, 864–74.

#### b. James Maxwell, M.D.—Industrial Commission of Arizona Consultative Examiner

On March 8, 2023, James Maxwell, M.D. performed an independent medical examination on Plaintiff pursuant to a request from the Industrial Commission of Arizona ("ICA"), following her July 26, 2022, injury. AR at 488–96. Plaintiff explained that she tripped on some uneven sidewalk pavement, catching her right toe, going down on both knees and hands, and falling onto her right side. *Id.* at 488. Plaintiff reported difficulty getting back up after the fall, even with assistance. *Id.* at 489. Plaintiff was taken to High Desert Clinic and examined by Louise Nosanchuck, M.D. on the same day. *Id.* Dr. Nosanchuck assessed bilateral knee contusions, ligament sprains of the lumbar spine, and various other sprains and strains. *Id.* Dr. Nosanchuck noted an antalgic gait and spasm of

the paraspinal and prescribed cyclobenzaprine and naproxen. AR at 489.

Dr. Maxwell noted Plaintiff's chief complaint was pain across her lower back, slightly greater on the left than right. *Id.* at 488. Plaintiff described the pain as constant and "dull" but stated that it would "grab" occasionally. *Id.* Plaintiff denied radiating pain, bowel or bladder problems, or other axial troubles. *Id.* Plaintiff further reported a chronic history or back trouble, possibly stemming from a 1984 parachuting accident while she was serving in the army. *Id.* Plaintiff conveyed that she was disabled for right hip pain due to that incident and was given a fifty percent (50%) impairment rating from the Army. AR at 488. Plaintiff further noted that her hip has been problematic since that time. *Id.* Plaintiff also reported undergoing a fusion surgery in 2017 which resulted in an approximate sixty percent (60%) improvement over her preoperative condition. *Id.*

Dr. Maxwell reviewed Plaintiff's medical records following the July 26, 2022, incident. *Id.* at 489–90. These included follow-up care with Dr. Nosanchuck, treatment with Jeffrey Scott, M.D. at Palo Brea Pain and Rehabilitation, and imaging at SimonMed. *Id.* Dr. Maxwell noted that "[o]verall since the fall, the claimant said she is improved to about 50%." AR at 490. Dr. Maxwell further noted that Plaintiff' relate[d] that she has been terminated from her job in November of 2022[,] [and] [s]he [wa]s not sure if she want[ed] to return as an electrician in the future because of climbing lifting, leaning, etc." *Id.*

Dr. Maxwell described Plaintiff's symptom diagram as showing "stabbing across [Plaintiff's] mid low back and in her right groin[,]" without radiation in either depiction. *Id.* Dr. Maxwell further reported Plaintiff's pain level ranged from two (2) to seven (7) out of ten (10), with her present pain at a three (3), which was also her current nighttime grade. *Id.* Dr. Maxwell noted aggravators of Plaintiff's pain included "[s]itting longer than 30 minutes[;] standing longer than 20 minutes[;] rising from a sitting position[;] driving longer than 60 minutes[;] lying on [her] side[;] and bending forward."[5] *Id.* Pain relievers included lying flat and medications. AR at 491. Dr. Maxwell listed Plaintiff's medications to

[5] Dr. Maxwell used the male possessive pronoun to refer to Plaintiff. AR at 490.

include Gabapentin, diclofenac, duloxetine, omeprazole, enalapril, and amlodipine. *Id*.

Dr. Maxwell reported that Plaintiff was not in acute distress and performed a physical examination focused upon her spine. *Id*. at 492. Dr. Maxwell's impression included "no sign of any neck injury[,]" and described Plaintiff as "permanent and stationary and need[ing] no further care at this point[,]" agreeing with Dr. Scott. *Id*. at 493. In response to questions posed by the ICA, Dr. Maxwell reported that Plaintiff had "no complaints today" and did not have a cervical issue as a result of the July 26, 2022, fall. *Id*. Dr. Maxwell observed that "at most she would have had a lumbar sprain/strain but if that is resolved, she has reverted to the baseline low back condition. AR at 493. Dr. Maxwell diagnosed "status post lumbar sprain/strain, resolved as a result of ground level fall on July 26, 2022." *Id*. Dr. Maxwell confirmed Plaintiff's pre-existing low back condition and opined that it "is a solid fusion and there is no evidence that it is aggravated in the fall[,] [s]he simply had a sprain." *Id*. at 494. Dr. Maxwell's only clinical findings were healed incisions, and he opined that no further medical treatment was necessary. *Id*. Dr. Maxwell further opined that Plaintiff was "at maximum medical improvement effective this date as it relates to the industrial injury of 7/26/22." *Id*. Dr. Maxwell concluded that "there [wa]s no objective evidence to support a permanent impairment rating in accordance with <u>The AMA Guidelines</u>[,]" because her sprain or strain was not ratable. AR at 495 (emphasis in original). Additionally, Dr. Maxwell opined that "[f]rom an industrial point of view, [he] s[aw] no reason to impose work restriction[.]" *Id*. at 495–96.

On May 8, 2023, Dr. Maxwell opined that Plaintiff could return to regular duty work on April 28, 2023. AR at 487. This was the same date that Dr. Maxwell designated temporary compensation and active medical treatment would terminate. *Id*. Dr. Maxwell further opined that Plaintiff's injury did not result in a permanent disability. *Id*.

**c. Stephen Borowsky, M.D. and John Bradway, M.D.—Industrial Commission of Arizona Consultative Examiners**

On April 28, 2023, Stephen Borowsky, M.D. and John Bradway, M.D. performed an independent medical examination of Plaintiff. AR 692–709. The examiners reviewed

Plaintiff's past medical history including service related injuries and her 2019 lumbar spine fusion, as well as hip and knee issues that pre-dated her July 26, 2022, fall. *Id*. at 692–93. The doctors also summarized the July 26, 2022, fall that injured Plaintiff, and her subsequent treatment. *Id*. at 693. Plaintiff denied shoulder pain prior to the accident. *Id*. The doctors also provided a comprehensive summary of Plaintiff's treatment with the High Desert Clinic, receipt of physical therapy, treatment with Jeffrey Scott, M.D., and Christopher Stevens, M.D. *Id*. at 693–94. Plaintiff's description of her ongoing shoulder pain was consistent with her treatment records. AR at 694. Similarly, her description of her right hip pain was consistent with her physical therapy records. *Id*. at 695.

The examiners listed Plaintiff's medication to include gabapentin, diclofenac, duloxetine, Omeprazole, enalapril, and amlodipine. *Id*. at 696. The report notes that Plaintiff uses "a walker but not every day, primarily for her back[,]" and "has chronic right hip bursitis and bilateral knee pain treated at the VA." *Id*. Examiners noted a normal left arm range of motion and strength, but a reduced range on the right. *Id*. Plaintiff endorsed pain several times during testing of the right arm and a positive Yergason's test. AR at 697. Plaintiff showed reduced hip flexion on the right and reported pain in the lateral hip, buttock, and groin on the right. *Id*. at 698. Plaintiff also had tenderness over the right greater trochanter and a positive Stinchfield test. *Id*. Examination of Plaintiff's knees was generally unremarkable, but with some tenderness on the lateral femoral epicondyle above the knee joint. *Id*.

Following a review of Plaintiff's post-fall medical records, the examiners answered questions from the industrial commission. *Id*. at 699–709. They opined that her bilateral knee and hip pain may have been exacerbated by the fall, but found them to be "clearly chronic and pre-existing issues." AR at 704. The examiners further opined that Plaintiff's shoulder injury was not as a result of the fall, although possibly exacerbated by it. *Id*. As relevant to the worker's compensation claim, the examiners posited that Plaintiff was likely at her maximum medical improvement ("MMI"). *Id*. at 705–09.

. . .

**d. Consultative Examiner Nichole Boyd, NP**

On May 13, 2023, Nichole Boyd, NP performed a consultative examination of Plaintiff upon request of the Arizona Department of Economic Security. AR 758–71. NP Boyd listed Plaintiff's current medications to include Omeprazole, amlodipine, enalapril, duloxetine, cholecalciferol, diclofenac, gabapentin, and an albuterol rescue inhaler. *Id*. at 760. Plaintiff's chief complaints consisted of lumbar sprain; right shoulder sprain; right and left hip pain; and right knee pain. *Id*. NP Boyd observed that Plaintiff used a walker as an assistive device for ambulation, had normal movements, sat comfortably without shifting in the chair, and was able to stand from a sitting position without difficulty. *Id*. at 761. NP Boyd reviewed Plaintiff's medical history, including her historical L3/4 lumbar fusion and her recent fall which resulted in hip pain, as well as sharp radicular pain into the right thigh and left buttocks. *Id*. NP Boyd observed that Plaintiff's call occurred four (4) weeks prior, and her pain has evolved into her hips bilaterally and low back. AR at 761. Plaintiff was pending to see a spinal specialist. *Id*.

Much of NP Boyd's physical examination of Plaintiff was unremarkable. *Id*. at 761–63. She noted that Plaintiff was unable to perform tandem walking; walking on heels; walking on toes; and squatting and rising. *Id*. at 763. NP Boyd further noted that Plaintiff exhibited a normal gait with her walker, which she used for her right hip pain when walking and standing, for support, balance, and stability. *Id*. at 764. NP Boyd found the walker to be medically necessary and reported that Plaintiff was cooperative during testing. AR at 764. Plaintiff exhibited a full range of motion in her cervical spine, shoulder, elbow, wrist, hand, ankle, and great toe. *Id*. at 764–66. Plaintiff showed a reduced range of motion in forward and lateral flexion to the right of the lumbar spine, but extension was normal. *Id*. at 764. Plaintiff also showed a reduced range of motion in her right hip on flexion, extension, abduction, adduction, internal rotation, and external rotation. *Id*. at 765–66. NP Boyd scored Plaintiff's effort during the examination as excellent. *Id*. at 766.

NP Boyd also completed a Medical Source Statement of Ability to Do Work-Related Activity for Plaintiff. AR at 766–71. NP Boyd listed Plaintiff's diagnoses as right

hip pain and back pain, which she opined would impose limitations lasting more than twelve (12) months. *Id*. at 767. NP Boyd denied Plaintiff had any restrictions on lifting or carrying, with a maximum capacity of less than ten (10) pounds occasionally, as well as frequently. *Id*. NP Boyd confirmed that Plaintiff had restrictions on standing and/or walking, opined that she could do these activities less than two (2) hours in an eight (8) hour workday, and limited her to 30 minutes at a time. *Id*. at 768. NP Boyd supported this finding based upon abnormalities in Plaintiff's back and hips noted during examination, which were consistent with Plaintiff's physical therapy records. *Id*. NP Boyd noted Plaintiff's use of an assistive device for balance and pain on all terrains, including uneven terrains. AR at 768. NP Boyd further noted that the device was medically necessary and prescribed by Plaintiff's primary care physician. *Id*. NP Boyd opined that Plaintiff was unrestricted in her ability to sit and was unlimited in her ability to see, hear, and speak. *Id*. NP Boyd further opined that Plaintiff could never climb ramps, stairs, ladders, ropes, or scaffolds; kneel; or crawl. *Id*. at 779. NP Boyd limited Plaintiff to occasional stooping and crouching, and did not place any limitation on her ability to reach, handle, finger, or feel. *Id*. She again supported her opinion with her physical examination of Plaintiff, confirmed by her physical therapy records. AR at 779. NP Boyd opined that Plaintiff could not work around heights or moving machinery; however, she did not have any environmental restrictions regarding extremes in temperature, chemicals, dust, fumes, gasses, or excessive noise. *Id*. NP Boyd supported her opinions with her physical examination and concurrent physical therapy notes. *Id*. at 770.

**e. Reviewing Physician Margaret Brummer, M.D.**

On May 25, 2023, Margaret Brummer, M.D. completed the initial review of Plaintiff's medical records and assessed her residual functional capacity. AR 57–65. Dr. Brummer opined that Plaintiff could occasionally lift and/or carry fifty (50) pounds and frequently lift and/or carry twenty-five (25) pounds.[6] *Id*. at 61. Dr. Brummer further opined that other than her ability to lift and/or carry, Plaintiff was unlimited in her ability

[6] Lifting and carrying include upward pulling. AR at 61.

push and/or pull with her upper and lower extremities. *Id*. Dr. Brummer submitted that Plaintiff could stand and/or walk, with normal breaks, for about six (6) hours in an eight (8) hour workday, and could sit for more than six (6) hours on a sustained basis in an eight (8) hour workday. *Id*. Dr. Brummer listed Plaintiff's postural limitations as frequent climbing ramps and stairs, balancing, stooping (bending at the waist), and crouching (bending at the knees), as well as occasional climbing ladders, ropes, and scaffolds, kneeling, and crawling. *Id*. at 62. Dr. Brummer found Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. AR at 62.

**f. Reviewing Physician Javier Torres, M.D.**

On October 21, 2023, Javier Torres, M.D. completed a review of Plaintiff's medical records upon reconsideration and reassessed her residual functional capacity. AR 68–77. Dr. Torres opined that Plaintiff could occasionally lift and/or carry fifty (50) pounds and frequently lift and/or carry twenty-five (25) pounds.[7] *Id*. at 72. Dr. Torres further opined that other than her ability to lift and/or carry, Plaintiff was unlimited in her ability push and/or pull with her upper and lower extremities. *Id*. Dr. Torres stated that Plaintiff could stand and/or walk, with normal breaks, for about six (6) hours in an eight (8) hour workday, and could sit for more than six (6) hours on a sustained basis in an eight (8) hour workday. *Id*. Dr. Torres listed Plaintiff's postural limitations as frequent climbing ramps and stairs, balancing, stooping (bending at the waist), and crouching (bending at the knees), as well as occasional climbing ladders, ropes, and scaffolds, kneeling, and crawling. *Id*. at 72. Dr. Torres found Plaintiff's ability to reach overhead with her right arm was limited to occasional because of her torn rotator cuff. AR at 73. Dr. Torres did not find any visual, communicative, or environmental limitations. *Id*.

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g),

---

[7] Lifting and carrying include upward pulling. AR at 61.

1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). "Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (citations omitted) (alterations in original).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted). Additionally, the Court will only review issues raised by Plaintiff in this cause of action. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008).

## III. ANALYSIS

Plaintiff asserts two issues for review. *See* Opening Br. (Doc. 16). First, she urges that "[t]he ALJ did not resolve inconsistencies between the vocational expert's (VE's) testimony and the DOT descriptions of the step 5 jobs at issue regarding their reaching

requirements." *Id*. at 5. Second, Plaintiff argues that "[t]he ALJ's RFC does not reasonably describe the 'total limiting effects' of her impairments, directly contrary to her finding that Plaintiff, a closely approaching retirement aged claimant, can lift 50 pounds one-third of the day and 25 pounds two-thirds of the day, and stand/walk most of the day." *Id*. at 11. In making the latter argument, Plaintiff challenges the ALJ's findings regarding the medical opinion evidence, as well as her treatment of Plaintiff's symptom testimony. For ease of analysis, the Court will start by considering these component parts.

***A. The Five-Step Evaluation***

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step One asks is the claimant "doing substantial gainful activity[?]" 20 C.F.R. § 404.1520(a)(4)(i). If yes, the claimant is not disabled. Step Two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is not disabled. Step Three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. 20 C.F.R. § 404.1520(a)(4)(iii). If not, the claimant is not disabled. Step Four considers the claimant's residual functional capacity and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If claimant can still do past relevant work, then he or she is not disabled. Step Five assesses the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. *Id.*

In the instant case, the ALJ found that Plaintiff "engaged in substantial gainful activity (SGA) during the following period: September 1, 2023–December 31, 2023"; "[h]owever, there has been a continuous 12-month period during which the claimant did not engage in substantial gainful activity." AR at 17–18 (citing 20 CFR 404.1520 and 404.1571, *et seq.*). At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: disorder of the spine, osteoarthritis, and

bursitis of the hip." *Id.* at 18 (citing 20 CFR 404.1520(c)). At step three, the ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" *Id.* (citing 20 CFR 404.1520(d), 404.1525 and 404.1526). Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant can lift and carry fifty (50) pounds occasionally and 25 pounds frequently[;] . . . can sit six hours and stand or walk six hours in an eight-hour workday[;] . . . can frequently balance (as defined in the Selected Characteristics of Occupations)[;] . . . can frequently climb ramps and stairs, and occasionally climb ladders, ropes, or scaffolds[;] . . . can frequently stoop and crouch[;] . . . can occasionally kneel and crawl[;] . . . [and] can occasionally reach overhead with the right upper extremity." *Id.* at 19. At step four, the ALJ observed that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills[.]" *Id.* at 23 (citing SSR 82-41; then citing 20 CFR Part 404, Subpart P, Appendix 2). At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" AR at 23 (citing 20 CFR 404.1569, 404.1569a). Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 24–25.

### *B. Plaintiff's Symptom Testimony*

Plaintiff challenges "the conclusory nature of the ALJ's findings." Opening Br. (Doc. 16) at 18. Plaintiff argues that "the ALJ's decision is just . . . a general description of the RFC finding, a statement that Plaintiff's statements are generally supported but not entirely supported, followed by a brief summary of the evidence, and ending with conclusory findings that are not explicitly tied to the record[,]" and therefore fails to provide a reasonable basis "for finding Plaintiff's symptoms are not reasonably supported by the record[.]" *Id.* at 19. Plaintiff further urges that the ALJ failed to delineate "specific,

clear, and convincing reasons" for rejecting Plaintiff's symptom testimony. Reply (Doc. 21) at 5 (citations omitted). Defendant contends that "[t]he ALJ pointed to specific evidence and examples of inconsistencies between Plaintiff's claims and the record, including evidence of effective and refused recommended treatment, to reasonably conclude that the record did not support the extent of Plaintiff's allegations." Response (Doc. 20) at 6. The Court agrees with Plaintiff and finds the ALJ did not provide clear and convincing reasons for discounting her symptom testimony.

**1. Legal Standard**

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding

required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). Additionally, SSR 16-3p[8] states, in relevant part:

> We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. We will evaluate an individual's symptoms based on the evidence in an individual's record as described below; however, not all of the types of evidence described below will be available or relevant in every case.
>
> * * *
>
> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, *available at* 2017 WL 5180304, at *5, 10 (Oct. 25, 2017).

**2. Analysis**

The ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 19. Next, the ALJ provided a brief statement regarding Plaintiff's pain testimony and with a brief review of her medical records. *Id*. at 20. The ALJ found "the claimant's noted impairments could reasonably be expected to cause a number of symptoms she has alleged; and there is a reasonable nexus between her impairments and her alleged symptoms such as pain and associated functional limitations." *Id*. The ALJ recognized that:

---

[8] Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. §§ 402.35(b)(1) and (2); *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984).

> [She] must consider in addition to the objective medical evidence, the claimant's work history; daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate or aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or used to relieve pain or other symptoms; and any factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms[.]

*Id*. at 20–1. After "considering all of the above, [the ALJ] f[ound] the record reflect[ed] some inconsistencies[,]" which "diminish[ed] the persuasiveness of [Plaintiff's] subjective complaints[.]" *Id*. at 21. The ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms are not entirely supported by the available evidence as a whole." *Id*.

**a. Improvement with physical therapy and medication**

Regarding Plaintiff's right shoulder pain, the ALJ noted that Plaintiff "completed physical therapy with resulting improvement in function of the right upper extremity[.]" AR at 20 (citing AR at 435, 708, 754, 764). The ALJ continued, however, acknowledging that Plaintiff had a "reduced range of motion with reaching and weakness due to pain following completion of physical therapy[.]" *Id*. (citing AR at 752–55). The ALJ also noted Plaintiff's "participat[ion] in physical therapy for knee pain prior to the period under consideration; and an x-ray showed mild degenerative arthritis of her knees with symptoms that improved with treatment[.]" *Id*. (citing AR at 422).[9] Regarding her bilateral hip pain, the ALJ highlighted Plaintiff's receipt of "an injection into her trochanteric bursa in April 2024 after reporting 50% relief from a similar procedure six months earlier[.]" *Id*. (citing AR at 896). Finally, the ALJ observed that Plaintiff "continues to take pain medication as prescribed without side effects so long as she times them exactly as prescribed." *Id*.

---

[9] The record cited does not address an improvement in knee pain, rather it is a letter from Harold Romero, PA-C in Orthopedics suggesting that as of August 17, 2021, Plaintiff "may require activity modification such as avoiding kneeling, squatting[,] etc." AR at 422.

Defendant recognizes that "[t]he type and effectiveness of treatment are factors to consider when evaluating symptom allegations." Response (Doc. 20) at 9 (citing 20 C.F.R. § 404.159(c)(3)(iv)–(v)). Defendant further urges "evidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Id*. (quoting *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017)). Defendant correctly states the general rules; however, an "ALJ [is] not permitted to 'cherry-pick' from . . . mixed [treatment] results to support a denial of benefits." *Garrison v. Colvin*, 759 F.3d 995, 1017 n.23 (9th Cir. 2014) (quotations and citations omitted). A review of the portions of Plaintiff's medical records cited by the ALJ demonstrates that she failed to choose "data points . . . [that] *in fact* constitute examples of a broader development [sufficient] to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018.

Regarding Plaintiff's shoulder, the ALJ recognized that although there was improvement, Plaintiff continued to exhibit physical deficits along with pain. *Id*. at 20. At no point does the ALJ attempt to explain how these records undermine Plaintiff's symptom testimony. *See Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) ("We require the ALJ to build an accurate and logical bridge from the evidence to her conclusions so that we may afford the claimant meaningful review of the SSA's ultimate findings."). Without such an explanation, the ALJ cannot be said to have offered "specific, clear and convincing reasons" for rejecting Plaintiff's symptom testimony. *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). Additionally, the ALJ appears to have discounted Plaintiff's shoulder related pain testimony because "the claimant subsequently presented for examination using a walker[,] . . . i.e., an assistive device requiring bilateral upper extremity function." AR at 20 n.4. The ALJ is not a medical expert and cannot make medical findings. *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) ("Hearing Examiner, who was not qualified as a medical expert, should not have gone outside the record to medical textbooks for the purpose of making his own exploration and assessment as to claimant's physical condition."); *Howell v. Kijakazi*, No. 20-cv-2517-BLM, 2022 WL 2759090, at * 7 (S.D. Cal. July 14, 2022) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th

Cir. 1996)) ("ALJs must no succumb to the temptation to play doctor and make their own independent medical findings.").

The ALJ's reference to improvement in Plaintiff's bilateral knee pain fails for the same reasons. The ALJ only referenced a single record and it did not represent what she stated. *See* n.9, *supra*. Nor did the ALJ offer any type of reasoning between her summary of the record and her rejection of Plaintiff's symptom testimony. As such, the ALJ's findings are not clear or convincing. *Lingenfelter*, 504 F.3d at 1036.

The ALJ next highlights Plaintiff's April 2024, hip injections. *Id*. at 20. The ALJ again fails to make any connection regarding the injections and Plaintiff's symptom testimony. As an initial matter, although she received some pain relief after the initial injection, her pain reduced to 4/10 following the injection and had increased again necessitating another injection. AR at 866, 896–97. Furthermore, the injections do not provide permanent relief and Plaintiff had been counseled that "most physicians limit the number of shots they will give you." *Id*. at 684 (counseling from Dr. Scott regarding options for shoulder treatment). The temporary pain relief Plaintiff obtained from hip injections is not a sufficient reason to discount her symptom testimony.

Finally, the ALJ notes Plaintiff's testimony that she "continues to take pain medication as prescribed without side effects so long as she times them exactly as prescribed." AR at 20. The ALJ misstates Plaintiff's testimony. Plaintiff did testify that she continued to take her pain medication as prescribed. *Id*. at 45. She also reported that they caused drowsiness and sometimes she could "fall asleep at the drop of a hat" due to the cumulative effect of her medications, particularly toward the end of the day. *Id*. at 45–6. The ALJ's misstatement does not provide a sufficient reason for discounting Plaintiff's symptom testimony.

Indeed, contrary to demonstrating an inconsistency, the medical records support Plaintiff's subjective complaints. The Ninth Circuit has made clear, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). The Ninth Circuit has further

cautioned that treatment records must "be interpreted with an awareness that improved functioning while being treated and while limiting stressors does not always mean that a claimant can function effectively in a workplace." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Hutsell v. Massanari*, 259, F.3d 707, 712 (9th Cir. 2001) ("[T]he Commissioner erroneously relied too heavily on indications in the medical record that Hutsell was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity."). The Court recommends a finding that substantial evidence does not support the ALJ discounting Plaintiff's symptom testimony due to an alleged improvement with physical therapy and medication. *See Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

**b. Refusal of treatment**

The ALJ also found Plaintiff's symptom testimony inconsistent because she "was offered a steroid injection or surgical treatment, but declined both with the understanding that she reached maximal [sic] medical improvement in April 2023 without such." AR at 20. Defendant observes that "[i]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." Answer (Doc. 20) at 9–10 (citing SSR 16-3p, 2017 WL 5180304 at *9). The Defendant omits the next sentence in the regulation, however, which states, "[w]e will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2017 WL 5180304 at *9. The ALJ failed to perform this analysis. Furthermore, Dr. Stevens noted that he discussed the potential risks of cortisone shots with Plaintiff which included a transient rise in blood glucose, infection, and damage to the cartilage. AR at 684. He further noted that Plaintiff "could consider a shoulder arthroscopy with debridement but this would be a last resort option and

fairly uncertain in terms of predictable pain relief." *Id.* The ALJ's failure to consider Plaintiff's refusal is error. The Court recommends a finding that the ALJ's determination that Plaintiff's declining more aggressive treatment is not substantial evidence controverting her symptom testimony. *See Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

**c. Worker's Compensation IME**

The ALJ found Plaintiff's testimony inconsistent because "Steven Borowsky, M.D., and John Bradway, M.D., noted the claimant entered the examination room with a limp favoring the right leg, [but] 'after the claimant left the exam, as observed through the window, that her gait was much improved, without distinct limp or at most very slight and not as predominant as observed in the exam room[.]" AR at 21 (citing AR at 696). Contrary to the ALJ's opinion, Plaintiff's symptom testimony is consistent with the examiners' observation—she consistently reported pain and stiffness following being in the car or sitting for too long, which improved with a change of position and stretching. *See, e.g.,* AR at 44, 717. The ALJ's rationale is not supported by substantial evidence.

**d. Activities of Daily Living**

The ALJ is reminded that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n.7 (citations omitted). The ALJ noted that "on February 27, 2024, the claimant 'state[d] that she is going to be traveling this year first prior to further evaluations of her inguinal hernia[.]" AR at 21 (citing AR at 883) (first alteration in original). The ALJ offers no reasoning as to why this statement is inconsistent with Plaintiff's symptom testimony. Nor is there any evidence regarding where Plaintiff might have been travelling to, whom she was travelling with, or for how long. The Court recommends a finding that substantial evidence does not support the ALJ's conclusion.

. . .

**e. Defendant's arguments**

The Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014). Although the Commissioner outlines additional reasons that the ALJ could reject Plaintiff's symptom testimony, this Court is bound "to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of Soc. Security Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) (citations omitted).

**f. Conclusion**

The ALJ's failure to explain her findings and simply stating a non-credibility conclusion, then summarizing the medical evidence is insufficient to establish clear and convincing evidence. *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). The Court recommends a finding that the ALJ failed to provide specific, clear and convincing reasons for discounting Plaintiff's testimony which is supported by substantial evidence in the record. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008). The ALJ did not set forth specific, clear and convincing evidence to reject Plaintiff's symptom testimony. *Id*. The Court further recommends a finding that this error was not harmless.

***C. Medical Opinion Evidence***

Plaintiff asserts that the ALJ made inconsistent findings when assessing the medical opinion evidence in this case. Opening Br. (Doc. 16) at 17. The Court agrees with Plaintiff.

**1. Legal Standard**

Section 404.1520c, 20 C.F.R., governs the analysis of medical opinions for disability claims filed on or after March 27, 2017. "Under the revised regulations, 'there is not an inherent persuasiveness to evidence from [government consultants] over [a claimant's] own medical source(s), and vice versa.'"[10] *Woods v. Kijakazi*, 32 F.4th 785,

---

[10] The Ninth Circuit Court of Appeals has held that its previous "requirement that ALJs

791 (9th Cir. 2022) (alterations in original) (quoting Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5844)). Rather, medical opinions are evaluated pursuant to the factors set forth in Section 404.1520c(c)(1)–(5), with the most important factors being supportability and consistency. 20 C.F.R. § 404.1520c(c); *see also* 20 C.F.R. § 404.1520c(b)(2). "Consistency means the extent to which a medical opinion is consistent with the evidence from other medical sources and non medical sources in the claim." *Stiffler v. O'Malley*, 102 F.4th 1102, 1106 (9th Cir. 2024) (quoting *Woods*, 32 F.4th at 792). "Supportability focuses on whether 'a medical source supports a medical opinion by explaining the relevant objective medical evidence.'" *Id.* (quoting *Woods*, 32 F.4th at 791–92). The regulations specifically require the ALJ to explain how he or she considered supportability and consistency in evaluating medical opinions and making the disability determination. 20 C.F.R. § 404.1520c(b)(2). Additionally, the ALJ may, but is not required to, consider other factors such as the medical source's relationship with the claimant, the medical source's area of specialization, or "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. 404.1520c(c)(3)–(5).

**2. <u>Analysis</u>**

The ALJ found both consultative examiners persuasive. AR at 21. The ALJ "also considered opinions expressed by independent medical examiners and find those by James Maxwell, M.D. . . . persuasive insofar as consistent with the residual functional capacity set forth in this decision." *Id.* The ALJ finds Dr. Borowsky and Dr. Bradway persuasive for the same reason.

Residual Functional Capacity ("RFC") is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions

---

provide 'specific and legitimate reasons' for rejecting a treating or examining doctor's opinion . . . is . . . incompatible with the revised regulations. *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2. The RFC is defined as "the most [a Plaintiff] can do still do [in a work setting] despite [their] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ's findings that the worker's compensation examiners opinions are persuasive to the extent that they conform to the RFC inverts her responsibility, "which is first to determine the medical impairments of a claimant based on the record and the claimant's credible symptom testimony and only *then* to determine the claimant's RFC." *Laborin v. Berryhill*, 867 F.3d 1151, 1154 (9th Cir. 2017) (quoting *Trevizo v. Berryhill*, 862 F.3d 987, 1000 n.6 (9th Cir. 2017)). By discounting the medical opinion evidence "to the extent that the are inconsistent with the RFC, the ALJ puts the cart before the horse." *Id*. (quotations omitted).

The ALJ's failure to properly analyze the opinion evidence put forth by the industrial commission examiners also infected her analysis of NP Boyd's report. *See* AR at 22. NP Boyd was the only examiner hired by the Social Security Administration to assess Plaintiff, she supported her findings with Plaintiff's statements, as well as the medical records, which were consistent with one another. *Id*. The ALJ rejected NP Boyd's opinion evidence for contradicting the evidence as a whole but was unclear regarding those contradictions. The Court is not required to guess what the ALJ was thinking when she wrote her decision. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d at 1225–26 (courts are required to "review the ALJ's decision based on the reasoning and factual findings offered by the ALJ"). Accordingly, the Court finds that the ALJ committed legal error in its analysis of the medical opinion evidence in this case and recommends a finding of legal error.

***D. Step 5 Error***

Because the Court has recommended a finding that substantial evidence did not support the ALJ's findings regarding Plaintiff's symptom testimony and the medical opinion evidence in this case, it declines to reach any alleged failures regarding the ALJ's analysis regarding Plaintiff's ability to perform other work. *See* Opening Br. (Doc. 16) at 5–15. The Court recommends directing the ALJ to hold a further hearing and obtain

additional Vocational Expert ("VE") testimony, if necessary.

***E. Remand***

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citing *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in assessing Plaintiff's symptom testimony, as well as the medical opinion evidence. The Court has concerns that "[a]llowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). There are two issues, however, which tip this matter in favor of remand. First, Plaintiff requests reversal and remand for further proceedings. Opening Br. (Doc. 16) at 21. Second, based on the record, it is not obvious to the Court that Plaintiff is disabled. Correcting the ALJ's error requires reconsideration of the evidence in this case. This analysis requires the ALJ to reanalyze Plaintiff's

symptom testimony, as well as reconsideration of the medical opinion evidence and other evidence in the record. The ALJ may also require additional vocational expert testimony and to hold another hearing.

## IV. CONCLUSION

Based on the foregoing, the Court recommends a finding that the ALJ committed legal error in assessing Plaintiff's symptom testimony and the medical opinion evidence. The Court recommends remanding for reanalysis and rehearing.

## V. RECOMMENDATION

For the reasons delineated above, the Magistrate Judge recommends that the District Judge enter an order REVERSING the Commissioner's decision and REMANDING for an award of benefits consistent with this opinion.

Pursuant to 28 U.S.C. § 636(b) and Rule 72(b)(2), Federal Rules of Civil Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). No replies shall be filed unless leave is granted from the Hon. Angela M. Martinez. If objections are filed, the parties should use the following case number: **CV-25-0328-TUC-AMM**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge may result in waiver of the right of review.

Dated this 27th day of July, 2026.

Eric J. Markovich
United States Magistrate Judge